*E-Filed 09/23/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HAROLD BLACK,

        Plaintiff,

v.

JOHN E. POTTER, Postmaster General,

        Defendant.
_____/

No. C 08-1344 RS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The United States Postal Service ("Postal Service") moves for summary judgment on Harold Black's Title VII disparate treatment and retaliation claims. Black claims the Postal Service unlawfully separated him from his position at the Petaluma Post Office in June of 2005 on the basis of his race, gender or national origin. While the focus of Black's Complaint is on his termination from the Petaluma site, he insists it cannot really be understood without reference to an incident that occurred several weeks earlier at the Bolinas Post Office. There, Black claims he was also unlawfully terminated and cites the behavior of the Bolinas Postmaster as evidence of her discriminatory motive (again, on the basis of gender, race, or national origin).

Prior to starting work at the Petaluma facility, Black filed an EEO complaint raising a disparate treatment claim in light of the events in Bolinas. Black was reassigned to an identical position with the Petaluma Post Office but was told he needed to take and pass a competency examination to keep the position. Black took the exam, failed, and was terminated. He argues the Postal Service selectively enforced the examination as a requirement of employment and introduces evidence of several other employees who failed the exam but retained their positions with the Petaluma Office. He contends the Postal Service's reliance on the examination as an employment requirement served as a pretext either for terminating him on the basis of his race, gender or national origin or in retaliation for filing his first EEO complaint. Black has presented a prima facie case of both disparate treatment and retaliation, and has presented a triable issue of fact on the question of whether or not the Postal Service selectively enforced the examination requirement as pretext for retaliation. Black has not, however, demonstrated that such enforcement was motivated by discriminatory animus on the basis of his gender, race or national origin. Accordingly, the Postal Service's motion for summary judgment is denied as to Black's retaliation claim but granted as to his disparate treatment claim.

## II.  FACTUAL BACKGROUND

Harold Black worked for the Postal Service from 1996 to 2005, when he claims he was unlawfully terminated. Black is a naturalized U.S. citizen, born in the Philippines. Prior to his positions in the Bolinas and Petaluma Post Offices, Black worked as a mail handler at the Richmond and Oakland Bulk Postal Centers. His tasks included sorting mail and entering zip codes for mechanical sorting. Black submits numerous positive performance evaluations from his supervisors. As Black explains them, these positions were temporary by design and it was always his goal to earn a "career" position with the Postal Service. Career employees receive employment benefits, union representation and certain other protections and privileges not afforded to temporary employees. A new employee must survive a ninety-day "probationary" period to achieve "career" status, and must also satisfy certain training requirements specific to the desired position.

Throughout his entire period of employment, Black apparently never graduated from probationary status.

In the spring of 2005, Black applied for and was offered a position on a probationary basis as a Sales and Service Distribution Associate ("SSDA") at the Bolinas Post Office. An SSDA employee engages in two principal activities: (1) mail sorting in the back area of a post office; and (2) customer service at a window counter. To operate the window, SSDA employees must attend a training course and pass a minimum competency test.

Postmaster Sharon Mantle interviewed Black and claims she decided to hire him over twelve other applicants because he had prior work experience with the Postal Service. It was in Bolinas that Black insists his discrimination claim took root. Black's first day of work was on May 4, 2005 and he reported to Postmaster Mantle. Mantle claims she asked Black to sort mail, including the American Automobile Association's *Via* publication and the *New Yorker* magazine. On Black's second day of work, Mantle insists that she saw him throw a *New Yorker* directly into a trash bin. When she peered into the bin, she claims she found "two feet," or "hundreds" of discarded copies. She confronted Black, who denied that he had thrown out any of the magazines. Black, in contrast, insists that Mantle's demeanor was unfriendly and unhelpful from the outset. He argues she once chastised him for leaving a toilet seat up in a shared restroom and, in a conversation about Black's background, told him he was "lucky" to have secured citizenship and employment in the United States after emigrating from the Philippines.

On what would have been Black's third day at the Bolinas Post Office, Mantle terminated him for throwing out mail. Black then lodged an EEO complaint alleging that his termination was a result of Mantle's discrimination on the basis of his race, national origin and gender. The parties attended a mediation process of some kind but did not reach a settlement. Soon thereafter, the central district office in San Francisco, largely as a result of efforts by the local postal union, offered Black an SSDA position at the Casa Grande Post Office in Petaluma. The Postal Service also contends Black's reassignment papers reflected that he would start a new probationary period and would need to "pass all training requirement[s] of the job [for which] he [was] being hired." (Def.'s

Mot. at 22-23.) The Postal Service instructed that Black report to Postmaster David Forsberg at the Petaluma location on June 11, 2005. Black began his training class shortly thereafter. Two instructors taught the class, and two other employees took the training course with Black. He failed the final examination and Forsberg delivered a letter of separation to Black on July 15, 2005.

The Postal Service maintains that, as a general rule, probationary SSDA employees who fail the window examination are terminated. It notes, however, that the Postal Service also makes exceptions in cases "where an agreement made during a union or EEO process leads to an agreement that the employee can continue with the Postal Service." Black disputes whether the Postal Service uniformly enforces the policy and points to probationary employees who worked in Petaluma, failed the SSDA examination, but were not terminated.

The Postal Service counters that, even if this is true, Black's case is different. The Postal Service negotiated what it refers to in its papers as a "second chance" agreement with Black. That is, even after separation for throwing out mail at Bolinas, the Postal Service agreed to give him another chance for employment in Petaluma. As part of this agreement, the Postal Service explains it would have insisted that he take and pass the SSDA test. In his deposition, Forsberg indicated that Black's hiring packet stated that Black was a new SSDA hire who was scheduled to participate in window training. Moreover, Forsberg testified that Black's hiring packet also provided that he *must* pass the test to keep the position. Forsberg did note that any requirement mandating that an employee pass the exam during a probationary period as a condition of continued employment would have come directly from the central district office. Moreover, Forsberg stated that Black is the *only* probationary employee he can recall firing for failing the exam.

Black points to two employees, Rebecca Wong and Candandeep Whala, who worked the morning shift in Petaluma and failed the window exam. Neither was terminated.[1] Wong is a non-Filipino, Asian female (her national origin is not cited in the record) who had worked for the Post Office since 1998. Unlike Black, she had already survived her ninety-day probationary period at the

---

[1] In his opposition papers, Black points to five other Postal Service employees who failed the SSDA window exam but retained employment with the Service. One of these employees, Andrew Evans, was also a probationary employee.

No. C 08-1344 RS
ORDER

4

time she failed the test. Accordingly, Forsberg explained that her exam failure would not have constituted grounds for termination, as her non-probationary status gave her some amount of job security. Whala is a South Asian female who was a new employee in 2005. Whala, like Black, was a probationary employee. Unlike Black, she had just begun employment with the Postal Service. When she failed the exam, she continued to work in Petaluma as a behind-the-scenes mail sorter. She eventually retook the test and passed. Postmaster Forsberg testified that nothing in her hiring file reflected that she was required to pass the test to avoid termination. Forsberg noted that the chief difference between Whala and Black, or at least the difference in their hiring papers, stemmed from the fact that Black's contract arose out of the "second chance" agreement.

## III. DISCUSSION

Black has satisfied the jurisdictional prerequisites for a federal action by filing timely charges of employment discrimination with the Commission and by receiving and acting upon the Commission's statutory notice of the right to sue. 42 U.S.C. §§ 2000e-5(a) and 2000e-5(e). Title VII states that it is an "unlawful employment practice" for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," § 2000e-2(a)(1), or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of" any of the same reasons, § 2000e-2(a)(2). It is similarly unlawful for an employer to retaliate against an individual because he or she has made a charge of discrimination or opposed a discriminatory practice. 42 U.S.C. § 2000e-3.

### A. Disparate Treatment

A person suffers disparate treatment in his employment "when he or she is singled out and treated less favorably than others similarly situated on account of" membership in a protected class. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (internal citations and

quotation marks omitted). As the plaintiff, Black carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To present such a prima facie case, Black must show: (1) that he is a member of a protected class; (2) that he was qualified for and performed his job satisfactorily; (3) that he suffered an adverse employment action; and (4) that his employer treated him differently than a similarly situated employee who does not belong to the same protected class. *McDonnell Douglas*, 411 U.S. at 802; *Cornwell*, 439 F.3d at 1028.

Establishing a prima facie case creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's membership in a protected class. *Cornwell*, 439 F.3d at 1028. The burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's termination." *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the *McDonnell Douglas* presumption drops from the analysis. The plaintiff may still, however, establish disparate treatment by introducing evidence that defendant's articulated reason is pretextual. Traditionally, a plaintiff does so "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (2009). When the evidence is direct, a plaintiff need only present "very little evidence to survive summary judgment in a discrimination case." *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (*quoting Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994)). "But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Id.* (*quoting Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005)). Here, the Postal Service contends that Black was neither qualified for the SSDA position nor similarly situated to other employees and therefore has not presented a prima facie case of discrimination.

1. Prima Facie Case
    a. Qualification

**United States District Court**
For the Northern District of California

1  Black's failure to pass the SSDA window training test, the Postal Service argues, renders
2  him unqualified for the position.  Black agrees that passing the test is a prerequisite for *window*
3  service.  He argues, however, that the Postal Service routinely allows SSDA employees who fail the
4  exam to continue in the position and perform only behind-the-scenes tasks until they re-take and
5  pass the test.  More simply, Black argues that the Postal Service treated the examination as an
6  employment qualification only in *his* case.  Black asks the Court to look instead to his nine years of
7  employment with the Postal Service and his almost uniformly positive reviews to reach the
8  inference that he was "qualified" for purposes of the *McDonnell Douglas* inquiry.

9  Black has at least presented a triable issue of fact regarding qualification.  Viewed in
10 isolation, the Postal Service's claim is straightforward: Black was simply required to take and pass a
11 test to qualify for (and keep) the SSDA position.  He did not pass the test and the easiest inference is
12 that he was not qualified.  Even if the Postal Service characterizes the test as a requirement for
13 window service, it appears that it often does not treat the examination as a requirement for continued
14 *employment*.  Because an examination is not uniformly treated as an employment requirement, it
15 should not operate as the basis on which Black's prima facie case fails.  Black's long history with
16 the office as a mail sorter does suggest he was *at least* qualified to fulfill the mail sorting function
17 until he was able to pass the test.

18     b.  <u>Similarly Situated Employee</u>

19 Individuals are similarly situated "when they have similar jobs and display similar conduct."
20 *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  Black points to two women,
21 Whala and Wong, who worked with him at the Petaluma Post Office during the 3:00 a.m. to 7:00
22 a.m. shift.[2]  Both women failed the SSDA test but neither was fired.  As detailed above, Wong was

---

[2] Defendant, relying on out-of-circuit authority, argues that employees must share the same supervisor in order to be "similarly situated" within the meaning of the *McDonnell Douglas* framework.  *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999) (noting that, to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct).  The Post Office contests Black's assumption that Forsberg supervised both Wong and Whala and points to the testimony of both women indicating that neither remembers if Forsberg acted as her direct supervisor.  Black has shown, however, that both women worked with him at the Petaluma Post Office, during the same shift.  Forsberg was the acting Postmaster there, even if he did not have a direct, or day-to-day supervisory role over Black, Wong,

NO. C 08-1344 RS
ORDER

7

not a probationary employee and is therefore not similarly situated to Black. What separated Black from Whala, the Postal Service maintains, was not that Black had "already been given one additional chance at a probationary period." Accordingly, the Postal Service insists that Black has not identified any other employee who was employed on a second chance basis, failed to meet a specific employment criterion, and then continued in the Postal Service's employ.

In *Leong v. Potter*, the Ninth Circuit upheld a finding that a Post Office employee was not similarly situated to his fellow employees in a factual context somewhat similar to this case. 347 F.3d 1117 (9th Cir. 2003). At the time of his termination, Leong was subject to a "Last Chance Agreement" negotiated as an alternative to termination after earlier, serious violations of Postal Service rules. *Id.* at 1124. Apparently, Leong had been repeatedly penalized for physical abuse and use of foul language in the workplace. One of the terms of this agreement required that Leong abstain from abusive language. When he violated the rule, the Postal Service terminated him. To present his prima facie case, Leong introduced evidence of other employees who were penalized but not fired for the use of equally foul language. The Court found that these employees were not similarly situated, as "they were not subject to such agreements." *Id.* The Court continued, "Although these employees did commit serious violations, it appears none amassed a record of misconduct comparable to Leong's." *Id.*

The Post Office argues that the reasoning in *Leong* applies seamlessly here. As the Court in *Leong* explained, the "Postal Service is generous in affording employees 'second chances,' but USPS must be permitted to draw the line somewhere." *Id.* As in *Leong*, Black was afforded a "second chance" after he allegedly violated Post Office rules and then failed to satisfy the agreement's requirements. The analogy to *Leong*, however, is not compelling. Unlike Leong's employment record, Black's performance reviews were uniformly positive (until, that is, the sudden

---

Whala, or any of that office's employees. Moreover, the Ninth Circuit recently rejected an argument similar to the one advanced by the Postal Service. *Hawn v. Exec. Jet Mgmt., Inc.*, No. 08-15903, 2010 WL 3218520, at *5 (9th Cir. Aug. 16, 2010). There, the Court emphasized what matters is that employees are similar in *material* respects. Depending on the factual circumstances, the identity of a particular supervisor may be immaterial if the employees are similarly situated in other, more meaningful ways. Black, Wong and Whala performed functionally identical work for the Petaluma Post Office.

turn of events in Bolinas). Moreover, Black challenges his "second chance" status as a product of Postmaster Mantle's allegedly discriminatory termination decision. He presents evidence to suggest that she at the least disliked Black and that his "second chance" agreement was less an act of mercy on the heels of misbehavior than an outgrowth of his EEO discrimination complaint.

While the question is close, drawing reasonable inferences in Black's favor, Black is not precluded from being classified as similarly situated to other probationary employees wholly because of his "second chance" status. Presumably, the Postal Service could always defeat an employee's prima facie presentation by characterizing an employment contract as a second or last chance arrangement (and the employment terms therein as "more" enforceable or ironclad than would otherwise be the case) anytime an employee negotiated his or her rehiring following an allegedly discriminatory termination.

Accordingly, Black has presented a triable issue of fact as to whether he was similarly situated to Whala: they were both probationary employees who held the SSDA position and worked the 3:00 a.m. to 7:00 a.m. shift in the Petaluma Post Office. Unlike in *Leong*, a factual dispute exists here as to the reasons behind Black's second chance status. Crucially, it is this very status that Black insists operates as pretext for the Postal Service's discrimination or retaliation. An employer should not be able to defeat an employee's prima facie presentation with the very same mechanism allegedly used to disguise a discriminatory or retaliatory decision.

2. <u>Legitimate Business Reason And Pretext</u>

The Postal Service insists that the examination requirement "ensures minimum standards for those employees who will be serving the public at Postal facilities." Black does not dispute that a minimum competency test is a "legitimate" business interest in the abstract. He disagrees that the Postal Service's testing requirement actually serves this purpose, as apparently not all employees are required to pass the test the first time to keep their positions. The Postal Service counters that Black was already afforded lenient treatment after he was discovered throwing out mail at the Bolinas facility; enforcing a minimum competency standard against an employee with a spotted record, the Postal Service contends, is a legitimate practice. The Postal Service suggests that while it may

NO. C 08-1344 RS
ORDER

9

single out those employees with a poor performance record, enforcement of the exam requirement against such employees would not by itself discriminate on the basis of race, national origin or gender. If neutrally applied in practice, the Postal Service's approach to repeat offenders, as it were, does appear to be a legitimate business practice.

Black insists, however, that the requirement that he pass the test the first time to keep his position was applied *in his case* as a pretext to fire him. Black asserts, first, that Postmaster Mantle was driven by an improper motive when she terminated him from the Bolinas Post Office. It was this allegedly unlawful termination that led to the "second chance" agreement under which Black was required to take and pass the test or face termination. He acknowledges that the Petaluma termination decision was made by separate actors but suggests these too were driven by the same discriminatory motive purportedly displayed by Mantle.

Aside from Mantle's unfriendly demeanor and her comments about the toilet seat and Black's citizenship, Black does not point to any direct evidence to show that the Postal Service selectively enforced the examination requirement and terminated him after failing the test because of his race, gender or national origin. He does argue, however, the Postal Service's inconsistent treatment of exam failure renders their explanation unworthy of credence. He points to Forsberg's testimony that he could not recall any other probationary employee who was terminated after failing the window test. Forsberg does not say, of course, that employees with spotted records were allowed to take and fail the test and Black does not suggest otherwise. Moreover, as even Black acknowledges, other probationary, male employees were not terminated after exam failure. Similarly missing is any evidence, let alone of a specific and substantial variety, to suggest that enforcement of the testing requirement against Black had anything to do with his race or national origin. Instead, the evidence reveals that Postmaster Mantle's comments and behavior were far-removed and only relevant insofar as her claim of discarded magazines (fabricated or not) inspired the second chance agreement.

Black insists the Postal Service has characterized his employment agreement as a second or last chance to disguise a purposefully discriminatory termination decision. Yet, he has presented

No. C 08-1344 RS
ORDER

virtually no evidence to cast doubt on the Postal Service's explanation. He has not, therefore, carried his burden and the Postal Service's motion for summary judgment on Black's disparate treatment claim must be granted.

### B. Retaliation

#### 1. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994). The Ninth Circuit has emphasized that "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from . . . the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). As in disparate treatment actions, a plaintiff claiming retaliation may rely on the *McDonnell Douglas* burden shifting framework. *Id.* at 1375.

The Postal Service disputes only the third element of the retaliation prima facie presentation. Black has introduced no evidence, the Postal Service points out, that Forsberg was ever aware of Black's EEO complaint. The Postal Service's point is unpersuasive for two reasons. It is clear from Forsberg's testimony that he was at least aware that Black had some form of "second chance" employment contract. As Forsberg pointed out, he also understood that second chance agreements were often the result of settlements or compromises made through the processing of an EEO complaint. Even assuming he was completely unaware that Black engaged in protected activity, Forsberg clearly indicates that the termination decision came not really from him but was instead mandated by the central office in Black's hiring papers (this office, of course, would have been aware of Black's history). Black also points out that only a small amount of time passed between the filing of his EEO complaint and his termination in Petaluma. This, Black suggests, undermines the Postal Service's denial that it singled him out or even imposed the harsher agreement against him as a direct result of his EEO complaint. Black was re-hired under the stricter terms of the Petaluma agreement just weeks after the Bolinas termination, promptly studied for and then failed

the SSDA test, and was terminated. As the Ninth Circuit has repeatedly emphasized, proximity in time may support an inference of retaliation sufficient to survive summary judgment. *See, e.g.*, *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) ("We have held that causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (internal quotation marks and citation omitted).

### 2. Legitimate Business Reason and Pretext

The Postal Service again relies on the examination requirement as a neutral business rationale. To make his pretext argument, Black insists the Postal Service's second chance agreement explanation is unworthy of credence. The Postal Service does not actually dispute that Black's second chance agreement arose, if not from a formal settlement of his EEO complaint, then at least as a result of a union employee's lobbying efforts on Black's behalf directly following his complaint. Forsberg also testified that second chance agreements are often the result of settlements following EEO complaints. A jury could infer that Black essentially had to comply with stricter requirements than his fellow employees *because* his complaint won him the second chance. The same jury might also conclude that the same agreement was entirely the product of Black's alleged misbehavior in Bolinas, and *not* because he participated in a protected activity. These facts are in dispute, and their resolution, therefore, belongs to a fact-finder.

## IV. CONCLUSION

Accordingly, while Black has not carried his burden of proof to show the Postal Service's explanation for his termination is a pretext for unlawful discrimination, he has highlighted disputed, material issues of fact that inform the question of whether the examination requirement served as a pretext to retaliate against Black for filing his EEO complaint. The Postal Service's motion for summary judgment must therefore be granted as to Black's disparate treatment claim but denied as to his retaliation claim.

IT IS SO ORDERED.

Dated: 9/23/10

NO. C 08-1344 RS
ORDER

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE